UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

EMERGENCY CARE SERVICES OF
PENNSYLVANIA, P.C. AND EMERGENCY
PHYSICIAN ASSOCIATES OF
PENNSYLVANIA, P.C.,

       Plaintiffs,      Case No.

 v.

UNITEDHEALTH GROUP, INC.,
UNITED HEALTHCARE SERVICES, INC.,
UNITEDHEALTHCARE, INC.
UNITEDHEALTH NETWORKS, INC.
UNITEDHEALTHCARE INSURANCE
COMPANY,
UNITEDHEALTHCARE OF NEW
ENGLAND, INC.
UNITEDHEALTHCARE OF
PENNSYLVANIA, INC.,

       Defendants.

## __COMPLAINT__

  AND NOW, Plaintiffs Emergency Care Services of Pennsylvania, P.C., and

Emergency Physician Associates of Pennsylvania, P.C., by and through their

undersigned counsel, bring this action against Defendants UnitedHealth Group, Inc.,

United HealthCare Services, Inc., UnitedHealthCare, Inc., UnitedHealth Networks,

Inc., UnitedHealthCare Insurance Company, UnitedHealthCare of New England,

Inc., and UnitedHealthCare of Pennsylvania, Inc., and in support thereof, make the

following averments based upon current knowledge and/or information and reasonable belief.

1.      Plaintiffs are local hospital-based physician practices who provide emergency medical care to all patients, regardless of insurance coverage or ability to pay.

2.      While Plaintiffs are treating patients 24 hours per day, 365 days per year, Defendants have manipulated, are continuing to manipulate, and have conspired to manipulate their payment rates to defraud Plaintiffs and deny them reasonable payment for their services, which the law requires.

3.      Defendants have reaped millions of dollars from this illegal, unfair, and fraudulent conduct, and stand to reap millions more if their conduct is not stopped.

## PARTIES

4.      Plaintiff Emergency Care Services of Pennsylvania, P.C. is a professional corporation that provides physicians and advance practice nurses who staff hospital emergency departments in Pennsylvania.  It is organized under the laws of the Commonwealth of Pennsylvania with its principal place of business at 1201 Langhorne-Newtown Road, Langhorne, PA 19047.

5.      Plaintiff Emergency Physician Associates of Pennsylvania, P.C. is a professional corporation that provides physicians and advance practice nurses to staff hospital emergency departments in Pennsylvania.  It is organized under the laws

of the Commonwealth of Pennsylvania with its principal place of business at 2500 Bernville Road, Reading PA 19605.  Unless necessary to distinguish between them, Plaintiffs Emergency Physician Associates of Pennsylvania and Emergency Care Services of Pennsylvania, will be collectively referred to as "Plaintiffs."

6.      Defendant UnitedHealth Group, Inc. is the largest single health carrier in the United States and is a corporation organized under the laws of the State of Delaware with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota 55343.  Defendant UnitedHealth Group, Inc. is a publicly-traded holding company that is dependent upon monies (including dividends and administrative expense reimbursements) from its subsidiaries, which include Defendant United Healthcare Services, Inc.

7.      Defendant United HealthCare Services, Inc. is a corporation organized under the laws of the State of Minnesota with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota 55343.  United HealthCare Services, Inc. is one of the entities that pay claims generated by Plaintiffs for services provided to members of Defendants' health insurance products.

8.      Defendant UnitedHealthCare, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 9800 Health Care Lane, Minnetonka, Minnesota 55343.  It is a subsidiary of Defendant United HealthCare Services, Inc., and provides administrative services to certain health

insurance plans.

9.     Defendant UnitedHealth Networks, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 9900 Bren Road East, Minnetonka, Minnesota 55343.  It is also a subsidiary of Defendant United HealthCare Services, Inc. and processes claims for certain insurance plans.

10.     Defendant UnitedHealthCare Insurance Company is a corporation organized and existing under the laws of the State of Connecticut with its principal place of business at 185 Asylum Avenue, Hartford, CT 06103 and is authorized to provide health insurance in Pennsylvania.

11.     Defendant UnitedHealthCare of New England, Inc. is a corporation organized and existing under the laws of the State of Rhode Island with its principal place of business at 475 Kilvert Street, Suite 310, Warwick, Rhode Island 02886, and is an authorized health maintenance organization ("HMO") in Pennsylvania.

12.     Defendant UnitedHealthCare of Pennsylvania, Inc. is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business at 1388 Beulah Road, Building 801, 4th Floor, Pittsburgh, PA 15235, and is an authorized HMO in Pennsylvania.

13.     Defendants UnitedHealthCare Insurance Company, UnitedHealthCare of New England, Inc., and UnitedHealthCare of Pennsylvania, Inc. provide, operate, and/or administer health insurance plans in Pennsylvania.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the federal claims for relief alleged in Counts I, II, and V pursuant to 18 U.S.C. §§ 1961, 1962, 1964 and/or 28 U.S.C. § 1331.

15.     This Court has the authority to grant declaratory relief under 28 U.S.C. §§ 2201 and 2202 because there is an actual controversy between Plaintiffs and Defendants.

16.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 and the doctrine of pendent jurisdiction over the state law claims asserted herein.

17.     Venue is proper in this District pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b)(2) because  a substantial part of the events giving rise to the claims asserted herein occurred in this District and because Defendants conduct business in this District.

## FACTUAL ALLEGATIONS

18.     Plaintiffs are professional emergency medical group practices that staff hospital emergency departments and treat emergency room patients at thirteen Pennsylvania hospitals.

19.     Plaintiffs provide emergency, life-saving care to all who walk through the hospitals' doors, regardless of insurance status.

20.     Indeed, federal law requires emergency medical providers, including

Plaintiffs, to provide treatment to patients who present themselves at hospital emergency departments.

21.     More specifically, under the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. §§ 1395dd(a)-(b), (d), (h), hospitals and the physicians who staff their emergency departments have a duty to screen and stabilize any individual who comes to the emergency department with an emergency medical condition, without inquiry into the individual's method of payment or insurance status.  42 U.S.C. §§ 1395(a)-(b), (h).

22.     The emergency services at issue in this litigation include treatment for cardiac arrest, broken bones, burns, shock, and distress.   These services are necessary and integral to the health and welfare of the communities in which Plaintiffs practice.

23.     Because the law requires that emergency services be provided without regard to insurance status, the law protects emergency service providers from predatory conduct by payors, including the kind of conduct that Defendants have engaged in here.

24.     If the law did not do so, emergency service providers would be at the mercy of insurance plans – forced to accept payment at any rate dictated by insurers under threat of receiving no payment, or forced to transfer the financial burden of care entirely onto patients.

25.     But providers are protected by law, which requires that, for the claims at issue in this case, the insurer must reimburse Plaintiffs at a reasonable rate.

26.     The hospitals where Plaintiffs provide emergency medical services routinely secure signed consents for treatment and assignments of benefits from each patient or the patient's authorized representative.

27.     These assignments of benefits state that the patient assigns to the providers of the medical service all rights to benefits under her insurance, including the right to claims and judgments.

**The Relationship Between Plaintiffs and Defendants**

28.     Defendants provide health insurance to their members (*i.e.*, their insureds).

29.     In exchange for premiums, fees, and/or other compensation, Defendants assume responsibility for paying for health care services rendered to members covered by their health plans.

30.     In addition, Defendants provide services such as building participating provider networks and negotiating rates with providers who join their networks.

31.     Defendants offer a range of health insurance plans.  Plans generally fall into one of two categories.

32.     "Fully Funded" plans are plans in which Defendants collect premiums directly from their members (or from third parties on behalf of their members) and

pay claims directly from the pool of funds created by those premiums.

33.   "Employer Funded" plans are plans in which Defendants provide administrative services to their employer clients, including processing, analysis, approval, and payment of health care claims, using the funds of the claimant's employer.

34.   Defendants provide coverage for emergency medical services under both types of plans.

35.   They are contractually and legally responsible for ensuring that their members can receive such services (a) without obtaining prior approval and (b) without regard to the "in network" or "out-of-network" status of the emergency services provider.

36.   Defendants highlight such coverage in marketing their insurance products, inducing members to purchase their products and rely upon those representations.

37.   For example, on the "patient protections" section of the UnitedHealthcare website, uhc.com, Defendants state:

> There are no prior authorization requirements for emergency services in a true emergency, even if the emergency services are provided by an out-of-network provider. Payment for the emergency service will follow the plan rules for network emergency coverage. This provision applies to all non-grandfathered fully insured and self-funded group health plans [Fully Funded plans], as well as group and individual health insurance issuers [Employer Funded plans].

38.     Payors typically demand a lower payment rate from contracted participating providers.

39.     In return, they offer participating providers certainty and timeliness of payment, access to the payor's formal appeals and dispute resolution processes, and other benefits.

40.     For all claims at issue in this lawsuit, Plaintiffs were non-participating providers, meaning they did not have an express contract with Defendants to accept or be bound by Defendants' reimbursement policies or in-network rates.

41.     Specifically, the reimbursement claims within the scope of this action are (a) non-participating commercial claims (including for patients covered by Affordable Care Act Exchange products), (b) that were adjudicated as covered, and allowed as payable by Defendants, (c) at rates below the billed charges and a reasonable payment for the services rendered, (d) as measured by the community where they were performed and by the person who provided them.  These claims are collectively referred to herein as the "Non-Participating Claims."

42.     The Non-Participating Claims involve only commercial and Exchange Products operated, insured, or administered by the insurance company Defendants. They do not involve Medicare Advantage or Medicaid products.

43.     Further, the Non-Participating Claims at issue under Counts III, IV, and V do not involve coverage determinations under any health plan that may be subject

to the federal Employee Retirement Income Security Act of 1974, or claims for benefits based on assignment of benefits.[1]

44.     Those counts concern the *rate* of payment to which Plaintiffs are entitled, not whether a *right* to receive payment exists.

45.     Defendants bear responsibility for paying for emergency medical care provided to their members regardless of whether the treating physician is an in-network or out-of-network provider.

46.     Defendants understand and expressly acknowledge that their members will seek emergency treatment from non-participating providers and that Defendants are obligated to pay for those services.

***The Reasonable Rate for Non-Participating Emergency Services is Well-Established***

47.     For many years, Defendants have allowed payment at 75-90% of billed charges for Plaintiffs' emergency services.

48.     Defendants have done so largely through the use of rental networks, which establish a reasonable rate for provider services through arms-length negotiations between the rental network and providers on the one hand, and the rental network and health insurance companies on the other.

---

[1] Plaintiffs understand, in any event, that Defendants do not require or rely upon assignments from their members in order to pay claims for services provided by Plaintiffs to their members.

49.     Rental networks act as "brokers" between non-participating providers and health insurance companies.

50.     A rental network will secure a contract with a provider to discount its out-of-network charges.

51.     The rental network then contracts with (or "rents" its network to) health insurance companies to allow the insurer access to the rental network and to the providers' agreed-upon discounted rates.

52.     As such, rental networks' negotiated rates act as a proxy for a reasonable rate of reimbursement for out-of-network emergency services, both in the industry as a whole and for particular payors.

53.     For many years, Plaintiffs' contracts with a range of rental networks, including MultiPlan, have contemplated a modest discount from Plaintiffs' billed charges for claims adjudicated through the rental network agreement.

54.      In practice, nearly all of Plaintiffs' non-participating provider claims submitted under Employer Funded plans from 2008 to 2018 were paid at between 75-90% of billed charges, including the Non-Participating Claims submitted to Defendants.

55.     This longstanding history establishes that a reasonable reimbursement rate for Plaintiffs' Non-Participating Claims for emergency services is 75-90% of Plaintiffs' billed charge.

56.     Beginning in January 2019, Defendants have slashed their reimbursement rate for Non-Participating Claims to less than half the average reasonable reimbursement rate.

57.     Defendants' drastic payment cuts are entirely inconsistent with the established rate and history between the parties.

***Defendants Have Tried to Pay Non-Participating Providers Unreasonable Rates***

58.     Defendants have a history of manipulating their reimbursement rates for non-participating providers to maximize their own profits at the expense of others, including their own members.

59.     In 2009, Defendant UnitedHealth Group, Inc. was investigated by the New York State Attorney General's Office for allegedly using its wholly-owned subsidiary, Ingenix, to illegally manipulate reimbursements to non-participating providers.

60.     The investigation revealed that Ingenix maintained a database of health care billing information that intentionally skewed reimbursement rates downward through faulty data collection, poor pooling procedures, and lack of audits.

61.     Defendant UnitedHealth Group, Inc. ultimately paid a $50 million settlement to fund an independent nonprofit organization known as FAIR Health to operate a new database to serve as a transparent reimbursement benchmark.

62.     In a press release announcing the settlement, the New York Attorney

General noted that: "For the past ten years, American patients have suffered from unfair reimbursements for critical medical services due to a conflict-ridden system that has been owned, operated, and manipulated by the health insurance industry."

63.     Also in 2009, for the same conduct, Defendants United HealthGroup, Inc., United HealthCare Insurance Co., and United HealthCare Services, Inc., paid $350 million to settle class action claims alleging that Defendants underpaid non-participating providers for services in *The American Medical Association, et al. v. United Healthcare Corp., et al.*, Civil Action No. 00-2800 (S.D.N.Y.).

64.     Since its inception, FAIR Health's benchmark databases have been used by state government agencies, medical societies, and other organizations to set reimbursement for non-participating providers.

65.     For example, the State of Connecticut uses FAIR Health's database to determine reimbursement for non-participating providers' emergency services under the state's consumer protection law.

66.     Defendants tout their use of FAIR Health and its benchmark databases to determine non-participating, out-of-network payment amounts on their website.

67.     For non-participating provider claims, the relevant United Health Group affiliate will "in many cases" pay the lower of a provider's actual billed charge or "the reasonable and customary amount," "the usual customary and reasonable amount," "the prevailing rate," or other similar terms that base payment

on what health care providers in the geographic area are charging.

68.    As for plans that do not set rates this way, Defendants' website implies that they are the exception, not the rule, and provides no information about how such plans would set rates.

69.    While Defendants give the appearance of holding themselves to independent benchmarks to set reimbursement rates – ones created from money paid to settle their prior deceptive practices – Defendants have found other ways to manipulate their reimbursement rate down from a reasonable rate in order to maximize their profits at the expense of providers such as Plaintiffs.

70.    For example, beginning in or around 2009, Defendants imposed significant cuts to Plaintiffs' reimbursement rate for Non-Participating Claims under Defendants' Fully Funded plans, without rationale or justification.

71.    Defendants pay claims under Fully Funded plans out of their own pool of funds, so every dollar that is not paid to Plaintiffs is a dollar retained by Defendants for their own use.

72.    Defendants' detrimental approach to payments for members in Fully Funded plans continues today: in 2019, Defendants have allowed payment to Plaintiffs at rates as low as 15-20% of billed charges.

73.    For example, for patient ZA,[2] who was treated by Plaintiffs on February 23, 2019 and is a member of a Fully Funded plan, Plaintiffs billed Defendants $685 for procedure code 99283, the code used for a moderately severe problem, and Defendants allowed just 15% of billed charges, or $103.98.

74.    This claim was reimbursed at a rate significantly below reasonable rates, described further below.

75.    As another example, Plaintiffs treated patient ZB, a member of a Fully Funded plan, on February 27, 2019, billed Defendants $1094 for procedure code 99284, the code used for problems of high severity, and Defendants allowed 19% of billed charges, or $204.00.

76.    Again, the claim was paid far below a reasonable reimbursement rate.

77.    As a result of these deep cuts in payments for services provided to members of Fully Funded plans, Defendants have not paid Plaintiffs a reasonable rate for those services since 2009.

78.    In so doing, they have illegally retained those funds.

79.    In 2017, Defendants also began to try to avoid paying a reasonable rate on its Employer Funded Plans, further exacerbating the financial damages to Plaintiffs.

---

[2] For confidentiality purposes, the patient's initials are redacted and are randomized, although the examples herein are true and accurate claim examples.

80.   From late 2017 to 2018, Plaintiffs attempted to negotiate with Defendants to be contracted as participating, in-network providers over the course of multiple meetings in person, by phone, and by email correspondence.

81.   As part of these negotiations, Plaintiffs met with Dan Rosenthal, President of Defendant UnitedHealth Networks, Inc., John Haben, Vice President of Defendant UnitedHealth Networks, Inc., and Greg Dosedel, Vice President of National Ancillary Contracting & Strategy at Defendant UnitedHealthCare Services, Inc.

82.   In or around December 2017, Mr. Rosenthal told Plaintiffs that the Defendants intended to implement a new benchmark pricing program specifically for their Employer Funded plans.

83.   Defendants then proposed to Plaintiffs a contractual rate for their Employer Funded plans that was roughly *half* the average reasonable rate at which Defendants had historically reimbursed Plaintiffs – a drastic and unjustified discount from what Defendants had been paying Plaintiffs for years on their non-participating claims in these plans, and an amount materially less than what Defendants were paying other contracted providers in the same market.

84.   Defendants' proposed rate was neither reasonable nor fair.

85.   Subsequently, in May 2018, Mr. Rosenthal escalated his threats, making clear during a meeting that, if Plaintiffs did not agree to contract for the

drastically reduced rates, Defendants would implement benchmark pricing that would reduce Plaintiffs' non-participating reimbursement by 33%.

86.    Dan Schumacher, the President and Chief Operating Officer of UnitedHealthCare and part of the Office of the Chief Executive of Defendant UnitedHealth Group, Inc., then said that, by April 2019, Defendants would cut Plaintiffs' non-participating reimbursement by 50%.

87.    Asked why the Defendants were forcing such dramatic cuts on Plaintiffs' reimbursement, Mr. Schumacher said it was simply "because we can."

88.    Defendants made good on their threats and knowingly engaged in a fraudulent scheme to slash reimbursement rates to Plaintiffs for non-participating claims submitted under its Employer Funded plans to levels at, or even below, what they had threatened in 2018.

89.    Defendants falsely claim that their new rates comply with the law because they contracted with a purportedly objective and transparent third party, Data iSight,[3] to process Plaintiffs' claims for their Employer Funded plans and to

---

[3] Data iSight is the trademark of an analytics service used by health plans to set payment for claims for services provided to Defendants' members by non-participating providers.  Data iSight is owned by National Care Network, LLC, a Delaware limited liability company with its principal place of business in Irving, Texas.  Data iSight and National Care Network, LLC will be collectively referred to as "Data iSight."  Data iSight is a wholly-owned subsidiary of MultiPlan, Inc., a New York corporation with its principal place of business in New York, NY. MultiPlan acts as a Rental Network "broker" and, in this capacity, has contracted since 2010 with Plaintiffs to secure reasonable rates from payors for Plaintiffs' non-

determine reasonable reimbursement rates.

90.   In fact, Defendants are working with Data iSight to hide the fact that they are imposing arbitrary and unreasonable payment rates on Plaintiffs that are not based on objective criteria.

91.   At the same time, Defendants have continued to advance their scheme on the negotiation front.

92.   On July 7, 2019, Mr. Schumacher advised, in a phone call, that Defendants planned to cut Plaintiffs' rates over three years to just 42% of the average and reasonable rate of reimbursement that Plaintiffs had received in 2018.

93.   Mr. Schumacher additionally advised that leadership across the Defendant entities were aware and supportive of the drastic cuts, but provided no objective basis for them.

94.   The next day, Angie Nierman, a Vice President of Networks at Defendant UnitedHealth Group, Inc., sent via interstate wires a written proposal reflecting Mr. Schumacher's stated cuts.

95.   In addition to denying Plaintiffs what is owed to them for the Non-Participating Claims, Defendants' scheme is an attempt to use their market power to reset the rate of reimbursement to unreasonably low levels.

---

participating emergency services.  Plaintiffs have no contract with Data iSight, and the Non-Participating Claims identified in this action are not adjudicated pursuant to the MultiPlan agreement.

***RICO Defendants' Fraudulent Scheme to Deprive Plaintiffs of Reasonable Reimbursement Violated the Racketeer Influenced and Corrupt Organizations Act (RICO)***

96.     Defendants UnitedHealth Group, Inc., United HealthCare Services, Inc., UnitedHealthcare Inc., and UnitedHealth Networks, Inc. (the "RICO Defendants") violated the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 et seq., and in particular, 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d) in connection with a scheme that the RICO Defendants devised, conducted, and participated in with unnamed third parties, including, but not limited to, Data iSight.

97.     The RICO Defendants conducted and participated directly or indirectly in the affairs of an association-in-fact enterprise ("the Enterprise") through a scheme that formed a pattern of racketeering activity.

98.     As part of this scheme, the RICO Defendants and Data iSight conspired to, and did knowingly and unlawfully, reduce Plaintiffs' reimbursement rates for the Non-Participating Claims to amounts significantly below the reasonable rate for services rendered to RICO Defendants' members, to the detriment of Plaintiffs and to the benefit and financial gain of RICO Defendants and Data iSight.

99.     To carry out the scheme and in furtherance of the conspiracy, RICO Defendants and Data iSight engaged in conduct that violated federal laws, including, *inter alia*, mail fraud in violation of 18 U.S.C. § 1341, and wire fraud in violation of

18 U.S.C. § 1343.

100.   As a result of the scheme, RICO Defendants violated 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d).

**RICO Defendants and Data iSight's Activities Constitute a Pattern of Unlawful Racketeering Activity**

101.   RICO Defendants and Data iSight have committed, and continue to commit, related predicate acts of racketeering activity involving mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, such that they have engaged in a "pattern of racketeering activity" under 18 U.S.C. § 1961(5) and pose a continued threat of racketeering activity, as described below.

102.   RICO Defendants and Data iSight have knowingly, wrongfully, and unlawfully reduced payment to Plaintiffs for the emergency services that Plaintiffs provided to Defendants' members, to the financial gain of the RICO Defendants and Data iSight.

103.   As a direct and proximate result of those activities, Plaintiffs have suffered millions of dollars in discrete financial losses.

**The Enterprise and Scheme**

104.   The Enterprise is comprised of RICO Defendants and third-party entities that develop software used in reimbursement determinations used by RICO Defendants, including Data iSight.

105.   RICO Defendants and Data iSight agreed to, and do, manipulate

reimbursement rates and control allowed payments to Plaintiffs through acts of the Enterprise.

106.   The Enterprise allows RICO Defendants and Data iSight to conceal their scheme by hiding behind written agreements and false statements.

107.   Since at least January 1, 2019, the Enterprise has falsely claimed to provide transparent, objective, and geographically-adjusted determinations of reimbursement rates through the use of Data iSight.

108.   In reality, Data iSight is used as a cover-up for RICO Defendants to justify paying reimbursement to Plaintiffs that is far less than the reasonable payment rate that Plaintiffs have historically received and are entitled to under the law.

109.   This scheme is concealed through the use of false statements on Data iSight's website and in RICO Defendants' and Data iSight's communications with providers, including Plaintiffs.

110.   The Enterprise's scheme, as described below, was, and continues to be, accomplished through written agreements, association, and sharing of information between RICO Defendants and Data iSight.

The Enterprise's False Statements

*Transparency*

111.   The Data iSight website claims to offer "Transparency for You, the Provider," and that the "website makes the process for determining appropriate

payment transparent to [providers]. . . so all parties involved in the billing and payment process have a clear understanding of how the reduction was calculated."

112.   Contrary to these claims, however, the Enterprise, through Data iSight, uses layers of obfuscation to hide and avoid providing the basis or method it uses to derive its purportedly "appropriate" rates.

113.   This concealment was designed by the Enterprise to, and does, prevent providers such as Plaintiffs from receiving a reasonable payment for the services they provide.

114.   For claims whose reimbursement is determined by Data iSight, non-participating providers receive an Explanation of Benefit form ("EOB") from Defendants with "IS" in the "Remark/Notes" column.

115.   Over the past six months, an ever-increasing number of Non-Participating Claims have been processed by Data iSight with drastically reduced payment amounts.

116.   By the end of June 2019, just over half of Non-Participating Claims submitted to RICO Defendants were being processed for payment by Data iSight.

117.   Yet RICO Defendants and Data iSight do not state, on the face of the EOBs, or anywhere else, any reason for the dramatic cut.

118.   Instead, the EOBs contain a note to call a toll-free number if there are questions about the claim.

119.   In June 2019, Plaintiffs contacted Data iSight via that number to discuss two claims for the same procedure code, performed at the same facility, that had both been billed at $700, but for which Data iSight had allowed reimbursement at only 42% and 59% of billed charges ($295.28 and $413.39, respectively).

120.   After Plaintiffs left messages at Data iSight's phone number for approximately two weeks, a Data iSight representative, Phina (Last Name Unknown) ("LNU"), finally connected with Plaintiffs; however, she was unable to explain why the two claims – for the same procedure at the same facility and billed at the same charge – were allowed at different rates.

121.   Further, when asked to provide the basis for the dramatic cut in payment for the claims, the representative did not and could not explain how the amount was derived or how it was determined that a cut was appropriate at all.

122.   The representative could only say that the payments on the claims represented a certain percentage of the Medicare fee schedule; she could not explain how Data iSight had arrived at that payment for either of the two claims, or why it allowed a different amount for each claim.

123.   Instead, the representative simply stated that the rates were developed by Data iSight and Defendants.

124.   When Plaintiffs continued to pursue the issue and spoke with a Data iSight supervisor, James LNU, to inquire as to the basis for these determinations,

James LNU responded that "it is just an amount that is recommended and sent over to United [Defendants]."

125.   When James LNU was expressly challenged on Data iSight's false claim that it is transparent with providers, he responded with silence.

126.   Further attempts to understand Data iSight and obtain information about the basis for its reimbursement rate-setting from Data iSight executives have also been futile.

127.   Data iSight and the RICO Defendants know that the rates that Data iSight have allowed for Plaintiffs' claims in 2019 are unreasonable and are not, in fact, based on objective, reliable data designed to arrive at a reasonable reimbursement rate.

128.   They know this because when a provider challenges the payment, Data iSight and RICO Defendants are authorized to revise the allowed amount back up to a reasonable rate, but only if the provider persists long enough in the process.

129.   This process to contest the unreasonable payment takes weeks to conclude for the provider and is impracticable to follow for every claim – a fact that RICO Defendants and Data iSight understand.

130.   For example, and as evidence of this fraudulent practice, Plaintiffs contested the allowed amounts on the two claims discussed above.

131.   Eventually, Carol LNU from Data iSight's "Quality Control" team

24

offered to allow payment of both claims at 85% of their respective billed charges.

132.   Thus, absent providers taking the time to chase every claim, Data iSight and RICO Defendants are able to get away with paying a rate that they know is not based on objective data and is far below the reasonable one.

133.   Moreover, the Enterprise's scheme of refusing to reimburse at reasonable rates unless and until Plaintiffs challenge its determinations continually harms Plaintiffs, in that, even if Plaintiffs eventually receive reasonable reimbursement upon contesting the rate, this scheme burdens Plaintiffs with excessive administrative time and expense and deprives Plaintiffs of their right to prompt payment of clean claims under Pennsylvania's Prompt Payment Act and related regulation.

*Defensible and Market Tested*

134.   The Enterprise's claim to "transparency" is not its only fraudulent claim.

135.   The Enterprise, through Data iSight, also falsely claims, on Data iSight's website, to set reimbursement rates in a "defensible, market tested" way.

136.   Claims processed by Data iSight contain the following note:

MEMBER: THIS SERVICE WAS RENDERED BY AN OUT-OF-NETWORK PROVIDER AND PROCESSED USING YOUR NTEWORK BENEFITS. IF YOU'RE ASKED TO PAY MORE THAN THE DEDUCTIBLE, COPAY AND COINSURANCE AMOUNTS SHOWN, PLEASE CALL DATA ISIGHT AT 866-835-

4022 OR VISIT DATAISIGHT.COM, THEY WILL WORK WITH THE PROVIDER ON YOUR BEHALF. **PROVIDER: THIS SERVICE HAS BEEN REIMBURSED USING DATA ISIGHT, WHICH UTILIZES COST DATA IF AVAILABLE (FACILITIES) OR PAID DATA (PROFESSIONALS).** PLEASE DO NOT BILL THE PATIENT ABOVE THE AMOUNT OF DEDUCTIBLE, COPAY AND COINSURANCE APPLIED TO THIS SERVICE.   IF YOU HAVE QUESTIONS ABOUT THE REIMBURSEMENT CONTACT DATA ISIGHT. (emphasis added).

137.   This note is intended to, and does, lead providers to believe that the reimbursement calculations are tied to external, objective data.

138.   Further, in its provider portal, Data iSight describes its "methodology" for reimbursement determinations as "calculated using paid claims data from millions of claims . . . . The Data iSight reimbursement calculation is based upon standard relative value units where applicable for each CPT/HCPCS code, multiplied by a conversion factor."

139.   Data iSight's parent company, MultiPlan, similarly describes Data iSight's process as using "cost- and reimbursement-based methodologies" and notes that it has been "[v]alidated by statisticians as effective and fair."

140.   These statements are also false.

141.   Data iSight's rates are not data-driven: they match the rate threatened by RICO Defendants in 2018 and are whatever RICO Defendants want, and direct Data iSight, to allow.

142.   For example, over three months, Plaintiffs submitted claims for three

patients who are members of Employer Funded plans under the procedure code 99285 (encompassing symptoms such as blunt trauma, severe infections, severe burns, and chest pain requiring multiple diagnostic tests), but received reimbursement in very different allowed amounts:

a.     Patient AA was treated by Plaintiffs on February 2, 2019. Plaintiffs billed RICO Defendants $1,463 for procedure code 99285, and RICO Defendants allowed $1,316.70 through MultiPlan, which is approximately 90% of billed charges – a reasonable rate, in line with the reasonable rate paid by RICO Defendants to Plaintiffs for non-participating provider services for many years.

b.     But, for patient AB, who was treated by Plaintiffs only six weeks later on March 13, 2019, RICO Defendants, through Data iSight, allowed only $609.28, which is only 42% of billed charges.

c.     Then, for patient AC, who was treated by plaintiffs on May 18, 2019, only eight weeks after AB, Plaintiffs billed $1,562 for the same procedure code[4] but RICO Defendants, through Data iSight, allowed only $435.20, or 29% of billed charges.

---

[4] The billed charge for patient AC differed slightly from billed charges for patients AA and AB because patient AC was seen at a different facility from patients AA and AB.

| PATIENT | DATE OF SERVICE | PLAN TYPE | PROCEDURE CODE | BILLED AMOUNT | ALLOWED AMOUNT | ALLOWED AMOUNT (%) |
|---------|-----------------|-----------|----------------|---------------|----------------|---------------------|
| AA | 2/2/19 | Employer Funded | 99285 | $1,463 | $1,316.70 | 90% |
| AB | 3/13/19 | Employer Funded | 99285 | $1,463 | $609.28 | 42% |
| AC | 5/18/19 | Employer Funded | 99285 | $1,562 | $435.20 | 29% |

143.   In another example, Plaintiffs submitted claims under the procedure code 99284 (encompassing symptoms such as respiratory illness and chest or abdominal pain requiring limited diagnostic testing) for patients in Employer Funded plans, again within weeks of each other, but RICO Defendants reimbursed at dramatically different and decreasing levels, negating any claim RICO Defendants have that their reimbursement determinations are tied to a reasonable, defensible, market-tested standard:

a.      Patient AD was treated by Plaintiffs on February 7, 2019. Plaintiffs billed RICO Defendants $1,094 for procedure code 99284, and RICO Defendants, through MultiPlan, allowed $984.60, which is 90% of Plaintiffs' billed charge.

b.      But, for patient AE, who was treated by Plaintiffs five weeks later on March 13, 2019, the RICO Defendants, through Data iSight, allowed only $413.39, which is approximately 38% of Plaintiffs' billed charge.

c.      Then, for patient AF, who was seen by Plaintiffs on May 11,

2019, eight weeks after AE, the RICO Defendants allowed only $295.28, which is approximately 28% of the billed charge of $1,073.

| PATIENT | DATE OF SERVICE | PLAN TYPE | PROCEDURE CODE | BILLED AMOUNT | ALLOWED AMOUNT | ALLOWED AMOUNT (%) |
|---------|-----------------|-----------|----------------|---------------|----------------|--------------------|
| AD | 2/7/19 | Employer Funded | 99284 | $1,094 | $984.60 | 90% |
| AE | 3/13/19 | Employer Funded | 99284 | $1,094 | $413.39 | 38% |
| AF | 5/11/19 | Employer Funded | 99284 | $1,073 | $295.28 | 28% |

144. This lock-step reduction, consistent with RICO Defendants' 2018 threats to drastically reduce rates even further if Plaintiffs failed to agree to their proposed contractual rates, spans a significant number of Plaintiffs' claims for payment for services to RICO Defendants' members.

145. From the above examples, it is clear that Data iSight is not using any externally-validated methodology to establish a reasonable reimbursement rate, as its rates are not consistent, defensible, or reasonable.

146. Rather, RICO Defendants, in complicity with Data iSight, increasingly reimburse for Plaintiffs at entirely unreasonable rates, in retaliation for Plaintiffs' objections to their reimbursement scheme, and completely contrary to their false assertions designed to mislead Plaintiffs and similar providers into believing that they will receive payment at reasonable rates.

147. This reimbursement is dictated by RICO Defendants, to the financial

detriment of Plaintiffs.

*Geographic Adjustment*

148.   In  addition  to  false  statements  regarding  transparency  and  its methodologies,  the  Enterprise  furthered  the  scheme  by  using  false  statements promising geographic adjustments to allowed rates.

149.   Indeed,  on  its  provider  portal,  Data  iSight  falsely  claims  that  "[a]ll reimbursements  are  adjusted  based  on  your  geographic  location  and  the  prevailing labor costs for your area."

150.   Data iSight's parent company, MultiPlan, further falsely states on its website that:

> For professional claims where actual costs aren't readily available, Data iSight determines a fair price using amounts generally accepted by providers as full payment for services.  Claims are first edited, and then priced using widely-recognized, AMA created Relative Value Units (RVU), to take the value and work effort into account [and] CMS Geographic Practice Cost Index, to adjust for regional differences . . . [then] Data iSight multiplies the geographically-adjusted RVU for each procedure by a median based conversion factor to determine the reimbursement amount.  This factor is specific to the service provided and derived from a publicly-available database of paid claims.

151.   Contrary  to  those  statements,  however,  claims  from  providers  in different geographic locations show that Data iSight does not adjust for geographic differences  but  instead,  works  with  RICO  Defendants  to  cut  uniformly  out-of-network provider payments across geographic locations.

152.   For example, patient WY was treated in Wyoming on January 21, 2019.

The provider billed RICO Defendants $779 for procedure code 99284, and RICO Defendants, via Data iSight, allowed $413.39.

153.    Four days later, patient NH was treated on the other side of the country in New Hampshire.  The provider billed RICO Defendants $1,047 for procedure 99284, and RICO Defendants, via Data iSight, again allowed $413.39.

154.    On February 8, 2019, patient OK was treated in Oklahoma. The provider billed RICO Defendants $990 for procedure code 99284, and RICO Defendants, via Data iSight, allowed $413.39.

155.    Two days later, patients KS and NM were treated in Kansas and New Mexico, respectively.  The providers billed RICO Defendants $778.00 and $895.00, respectively, for procedure code 99284, but for both of these claims, RICO Defendants, via Data iSight, allowed exactly $413.39.

156.    One month later, patient CA was treated in California.  The provider billed RICO Defendants $937.00 for procedure code 99284.  RICO Defendants, via Data iSight, yet again allowed exactly $413.39.

157.    Two months later, on May 20, 2019, Plaintiff Emergency Physician Associates of Pennsylvania treated patient PA in Pennsylvania.  Plaintiff billed RICO Defendants $1,094 for procedure code 99284, and RICO Defendants, via Data iSight, allowed, unsurprisingly, exactly $413.39.

| PATIENT | LOCATION | DATE OF SERVICE | BILLED AMOUNT | PROCEDURE CODE | ALLOWED AMOUNT |
|---|---|---|---|---|---|
| WY | Wyoming | 1/21/19 | $779 | 99284 | $413.39 |
| NH | New Hampshire | 1/25/19 | $1047 | 99284 | $413.39 |
| OK | Oklahoma | 2/8/19 | $990 | 99284 | $413.39 |
| KS | Kansas | 2/10/19 | $778 | 99284 | $413.39 |
| NM | New Mexico | 2/10/19 | $895 | 99284 | $413.39 |
| CA | California | 3/25/19 | $937 | 99284 | $413.39 |
| PA | Pennsylvania | 5/20/19 | $1,094 | 99284 | $413.39 |

158.    Defendants falsely claim on their website to "frequently use" the 80th percentile of the FAIR Health Benchmark databases "to calculate how much to pay for out-of-network services."

159.    The 80th percentile of FAIR Health Benchmark databases clearly shows that reimbursement for the above non-participating provider charges, when actually based on a geographically-adjusted basis, would not only vary widely, but also all be higher than the allowed $413.39:

| LOCATION | PROCEDURE CODE | 80th PERCENTILE OF FAIR HEALTH BENCHMARK |
|---|---|---|
| Wyoming | 99284 | $1105 |
| New Hampshire | 99284 | $753 |
| Oklahoma | 99284 | $1076 |
| Kansas | 99284 | $997 |
| New Mexico | 99284 | $1353 |
| California | 99284 | $795 |
| Pennsylvania | 99284 | $859 |

The Enterprise's Predicate Acts

160.   To perpetuate the scheme and conceal it from Plaintiffs, in or around 2018 RICO Defendants and Data iSight entered into written agreements with each other that are consistent with Data iSight's agreements with similar health insurance companies.

161.   Under those contracts, Data iSight would handle claims determinations for services rendered to RICO Defendants' members under pre-agreed thresholds set by RICO Defendants.

162.   By no later than 2019, RICO Defendants and Data iSight then coordinated and effectuated, via wire communications, the posting of false statements on websites and the communication of false statements to providers, including Plaintiffs, in furtherance of the scheme.

163.   These statements include Data iSight and its parent company using interstate wires to post, on its websites, that it would provide a transparent, defensible, market-based, and geographically-adjusted claims adjudication and payment process for providers.

164.   Data iSight communicated to Plaintiffs by phone and by email in June 2019 that, contrary to its website's claims to transparency, Data iSight could not provide a basis for its unreasonably low allowed amount, mustering only that "it is just an amount that is recommended and sent over to United [Defendants]."

165.   Finally, after weeks of pressure, Data iSight informed Plaintiffs by phone that it would, after all, allow payment on the contested claims at a reasonable rate: 85% of billed charges.

166.   In short, the Enterprise perpetuated its scheme by communicating, via wire communications, threats regarding reimbursement cuts to Plaintiffs in late 2017 and 2018.

167.   Then, after making good on those threats, the Enterprise communicated, via wire communications, false and misleading information to Plaintiffs and falsely denied that it had information requested by Plaintiffs about the basis for the drastically-cut and unreasonable reimbursement rates that RICO Defendants sought to impose.

168.   In addition, since at least January 1, 2019, the Enterprise has furthered this scheme by communicating payment amounts and making reimbursement payments to Plaintiffs by means of the United States Postal Service and interstate wires at unlawful rates that were far below reasonable rates for the services provided.

169.   For example, on June 11, 2019, RICO Defendants sent Plaintiffs, via wire communications, EOBs for emergency services provided to patients under multiple procedure codes, including the following EOBs for procedure code 99285:

      a.     Patient BB was treated on May 13, 2019 at a billed charge of $1,048.00, for which RICO Defendants, via Data iSight, allowed $435.20.

b.     Patient BC was treated on May 15, 2019 at a billed charge of $1,542.00, for which RICO Defendants, via Data iSight, allowed $435.20.

c.     Patient BD was treated on May 26, 2019 at a billed charge of $1012.00, for which RICO Defendants, via Data iSight, allowed $435.20.

| PATIENT | DATE OF SERVICE | BILLED AMOUNT | PROCEDURE CODE | ALLOWED AMOUNT | ALLOWED AMOUNT (%) |
|---------|-----------------|---------------|----------------|----------------|--------------------|
| BB | 5/13/19 | $1,048 | 99285 | $435.20 | 42% |
| BC | 5/15/19 | $1,542 | 99285 | $435.20 | 28% |
| BD | 5/26/19 | $1,012 | 99285 | $435.20 | 43% |

170.   RICO Defendants and Data iSight expected that those unreasonable payments would be accepted in full satisfaction of Plaintiffs' claims.

171.   RICO Defendants and Data iSight have received, and continue to receive, financial gains from their scheme to defraud Plaintiffs.

172.   For the services that Plaintiffs provided to patients under RICO Defendants' Employer Funded plans in 2019, only 36% of the Non-Participating Claims have, to date, been reimbursed at reasonable rates, resulting in millions of dollars in financial loss to Plaintiffs.

173.   The purpose of, and the direct and proximate result of the above-alleged Enterprise and scheme was, and continues to be, to unlawfully reimburse Plaintiffs at unreasonable rates, to the harm of Plaintiffs, and to the benefit of the Enterprise.

## COUNT I
## Violation of RICO, 18 U.S.C. § 1962(c) (as against the RICO Defendants)

174.   Plaintiffs re-allege and restate paragraphs 1 through 173 above as if they were fully set forth herein.

175.   Plaintiffs are each a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

176.   RICO Defendants are each a "person" within the meaning of 18 U.S.C. § 1961(3).

177.   As set forth above, since at least January 2019, RICO Defendants have been and continue to be, a part of an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), comprised of at least RICO Defendants and Data iSight, and which Enterprise was and is engaged in activities that span multiple states and affect interstate commerce.

178.   Each of the RICO Defendants has an existence separate and distinct from the Enterprise, in addition to directly participating and acting as a part of the Enterprise.

179.   RICO Defendants and Data iSight had, and continue to have, the common and continuing purpose of dramatically reducing allowed provider reimbursement rates to for their own pecuniary gain, by defrauding Plaintiffs and preventing Plaintiffs from obtaining reasonable payment for the services they

provided to RICO Defendants' members, in retaliation for Plaintiffs' lawful refusal to agree to RICO Defendants' massively discounted and unreasonable proposed contractual rates.

180.   As set forth above, the RICO Defendants since at least January 2019, have been and continue to be, engaged in a scheme to defraud Plaintiffs by committing a series of unlawful acts which constitute predicate racketeering acts under 18 U.S.C. §§ 1961(1)(B) and 1962(c), involving multiple instances of mail fraud in violation of 18 U.S.C. § 1341 and multiple instances of wire fraud in violation of 18 U.S.C. § 1343.

181.   Each RICO Defendant provides benefits to insured members, processes claims for services provided to members, and/or issues payments for services and knows and willingly participates in the scheme to defraud Plaintiffs.

182.   As a direct and proximate result of RICO Defendants' violations of 18 U.S.C. § 1962(c), Plaintiffs were injured in their business, suffering financial losses of millions of dollars within the meaning of 18 U.S.C. § 1964(c).

## COUNT II
## Violation of RICO conspiracy, 18 U.S.C. § 1962(d) (as against the RICO Defendants)

183.   Plaintiffs re-allege and restate paragraphs 1 through 173 above as if they were fully set forth herein.

184.   Plaintiffs are each a "person" within the meaning of 18 U.S.C. §§

1961(3) and 1964(c).

185.   RICO Defendants are each a "person" within the meaning of 18 U.S.C. § 1961(3).

186.   As set forth above, since at least January 2019, RICO Defendants have been and continue to be, part of an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4), comprised of at least RICO Defendants and Data iSight, and which Enterprise was and is engaged in activities that span multiple states and affect interstate commerce.

187.   RICO Defendants were and continue to be associated with the Enterprise and knowingly conspired, within the meaning of 18 U.S.C. § 1962(d), to violate 18 U.S.C. § 1962(c) by conducting and participating, directly or indirectly, in the conduct and affairs in the Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961 (1)(B) and 1962(c), including multiple instances of mail fraud in violation of 18 U.S.C. § 1341 and multiple instances of wire fraud in violation of 18 U.S.C. § 1343, in order to defraud Plaintiffs of a reasonable reimbursement of services.

188.   As a direct and proximate result of RICO Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs were injured in their business, suffering financial losses of millions of dollars within the meaning of 18 U.S.C. § 1964(c).

## COUNT III
### Breach of Implied-in-Fact Contract under Pennsylvania Law (as against all Defendants)

189.   The allegations set forth in Paragraphs 1 through 173 above are incorporated herein by reference as though fully set forth.

190.   Defendants knew or should have known that Plaintiffs expected reasonable payment for the emergency services they provided.

191.   For this reason, Defendants consistently adjudicated the Non-Participating Claims as covered and medically necessary and paid Plaintiffs for such Non-Participating Claims.

192.   However, the payments made have been below the reasonable value of the services rendered (1) at all material times, for members under the Fully Funded plans, and (2) since 2019 for members in the Employer Funded plans.

193.   Defendants' underpayment of the Non-Participating Claims violates the duty they owe to Plaintiffs.

194.   Plaintiffs and Defendants do not voluntarily choose to transact business with each other, and neither party has a choice in the matter.

195.   Plaintiffs and Defendants are compelled to operate together as a result of their concomitant legal duties, namely (1) a physician's duty under federal law to treat emergency room patients regardless of their insurance coverage or ability to pay, and (2) Defendants' legal and contractual responsibility to pay for emergency

services.

196.   An implied-in-fact contract must therefore be imposed by law to prevent a grave injustice, specifically an enormous economic windfall in Defendants' favor from Plaintiffs' provision of emergency services to Defendants' members without payment of reasonable compensation.

197.   In breach of their implied contract with Plaintiffs, Defendants have processed and continue to process the Non-Participating Claims at rates substantially below the reasonable value of the emergency services provided to those members by Plaintiffs (1) at all relevant times, for members in the Fully Funded plans and (2) since 2019 for members in Employer Funded plans.

198.   Plaintiffs have performed all obligations under their implied contract with Defendants necessary for Plaintiffs to be reimbursed for the Non-Participating Claims at the reasonable value of the services rendered.

199.   At all material times, all conditions precedent have occurred that were necessary for Defendants to perform their obligation to pay Plaintiffs on the Non-Participating Claims at the reasonable value of the emergency services provided by Plaintiffs.

200.   Plaintiffs did not agree that the lower reimbursement rates paid by Defendants were reasonable or sufficient to compensate Plaintiffs for the emergency medical services provided to Defendants' members by Plaintiffs.

201.   As a result of Defendants' breach of their implied contract to pay Plaintiffs for the Non-Participating Claims at the reasonable and lawful value of the services rendered, Plaintiffs have suffered injury and are entitled to monetary damages from Defendants to compensate them for their injury.

202.   Plaintiffs have suffered damages in an amount equal to (1) the difference between the amounts Defendants unilaterally allowed as payable for Non-Participating Claims and the reasonable value of the emergency medical services provided as to such claims, plus (2) Plaintiffs' loss of use of those funds.

## COUNT IV
## Unjust Enrichment under Pennsylvania Law (as against all Defendants)

203.   The allegations set forth in Paragraphs 1 through 173 above are incorporated herein by reference as though fully set forth.

204.   Under Pennsylvania law, a cause of action for unjust enrichment is stated where benefits are conferred upon defendant by plaintiff; there is appreciation of such benefits by the defendant; and acceptance and retention of such benefits under such circumstances that it would be inequitable for Defendant to retain the benefit without payment of value.

205.   The essential inquiry in any action for unjust enrichment or restitution is whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered.

206.   Plaintiffs have complied with their legal obligations under federal law to provide and continue to provide emergency services to the Defendants' members in good faith.

207.   Defendants are not lawfully permitted to prevent their members from seeking emergency services from Plaintiffs.

208.   Given the nature of these relationships, an equitable obligation arises to require that Defendants reasonably compensate Plaintiffs for the emergency services rendered by Plaintiffs to Defendants' members.

209.   In the absence of such an obligation, Defendants would enrich themselves unjustly at the expense of Plaintiffs.

210.   Thus, Defendants are legally obligated to pay Plaintiffs the reasonable value of the services rendered by Plaintiffs as measured by the community where the services were performed and by the person who provided them.

211.   However, as to the Non-Participating Claims, Defendants have failed to reimburse the Plaintiffs for the reasonable value of the services provided by Plaintiffs and Defendants have, therefore, been unjustly enriched by the difference between the reasonable value of the physicians' services and the amount allowed by Defendants (*i.e.*, the amount paid by Defendants plus the individual liability of the members).

212.   The emergency services provided by Plaintiffs to Defendants' members

materially benefit Defendants by discharging their contractual obligations to their insureds.

213.   The benefit that Defendants receive from the emergency services provided by Plaintiffs is, therefore, significant.

214.   In exchange for premiums and/or other compensation, Defendants assume a duty to provide coverage to their members for emergency services. Satisfying this "core obligation" is a material benefit in Defendants' favor.

215.   Under these circumstances, it would be unjust and inequitable for Defendants to retain the benefits they received without paying the value of those benefits, *i.e.*, by paying Plaintiffs *quantum meruit*, or the reasonable value of the emergency services provided by Plaintiffs in the context of the Non-Participating Claims.

216.   Plaintiffs seek compensatory damages, as permitted by applicable law, in an amount that will continue to accrue through the date of trial as a result of Defendants continuing unjust enrichment, equal to (1) the difference between the amount Defendants processed as payable for those services and the reasonable value of the emergency medicine care provided by the agents, servants, and employees of Plaintiff, plus (2) the loss of use of that money.

## COUNT V
## Declaratory Relief (as against all Defendants)

217.   Plaintiffs   incorporate   by   reference   the   allegations   set   forth   in

Paragraphs 1 through 173 above as though fully set forth.

218.   This is an action for declaratory relief pursuant 28 U.S.C. § 2201, which is necessary and appropriate to clarify the parties' respective rights, status, and legal relations concerning Defendants' payment obligations to Plaintiffs for the emergency services they provide to Defendants' members.

219.   All adverse parties are presently before the court.

220.   Plaintiffs have been and continue to be harmed by Defendants' underpayments for emergency services that Plaintiffs are legally obligated to render to Defendants' members.

221.   Plaintiffs therefore seek a declaration establishing the appropriate reimbursement rates to be paid by Defendants to prevent further harm to Plaintiff.

222.   Plaintiffs specifically seek a determination that (1) Defendants have an obligation to reimburse Plaintiffs for the services rendered to Defendants' members at rates equal to the reasonable value of the emergency services rendered; and (2) that the rates Defendants have paid on Non-Participating Claims (a) at all relevant times for members under their Fully Funded plans and (b) since 2019, for members in their Employer Funded plans, are inadequate and violate their obligation to pay Plaintiffs for their services rendered at a reasonable value.

223.   To avoid the potential for successive, separate actions enforcing the Plaintiffs' rights, Plaintiffs seek a declaration from the Court stating that the

Defendants are obligated to pay Plaintiffs prospectively for the emergency medical services rendered by Plaintiffs for the Non-Participating Claims at the reasonable value thereof.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury of any issue trial of right by a jury.

## **RELIEF REQUESTED**

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court:

(1) Enter judgments against the RICO Defendants and in favor of Plaintiffs pursuant to the First and Second Causes of Action in an amount constituting treble damages resulting from Defendants' underpayments to Plaintiffs for the reasonable value of the emergency services provided to Defendants' members and reasonable attorneys' fees incurred in bringing this action;

(2) Enter judgments against Defendants and in favor of Plaintiffs pursuant to the Third and Fourth Causes of Action in an amount representing the difference between the amounts deemed payable by Defendants and the reasonable value of the emergency services rendered by Plaintiffs together with the loss of use of said funds, as determined after trial, plus interest;

(3) Enter a decree pursuant to 28 U.S.C. § 2201 requiring that Defendants must pay to Plaintiffs prospectively for the emergency medical services

provided by the agents, servants, and employees of Plaintiffs to Defendants' members amounts that represent the reasonable value of said services, as determined after trial; and

(4) Such other relief as the Court determines to be just and proper.

Dated: July 11, 2019                    Respectfully submitted,

                                        /s/ *Bridget E. Montgomery*
                                        Bridget E. Montgomery, PA Bar # 56105
                                        Eckert Seamans Cherin & Mellott, LLC
                                        213 Market St., 8th Floor
                                        Harrisburg, PA 17101
                                        (717) 237-6054
                                        BMontgomery@eckertseamans.com

                                        Alan D. Lash, FL Bar #510904 (*pro hac vice*
                                        application forthcoming)
                                        Justin C. Fineberg, FL Bar #0053716 (*pro
                                        hac vice* application forthcoming)
                                        Michael L. Ehren, FL Bar # 0043768 (*pro
                                        hac vice* application forthcoming)
                                        Lash & Goldberg LLP
                                        100 S.E. 2nd Street, Suite 1200
                                        Miami Tower
                                        Miami, Florida 33131
                                        (305) 347-4040
                                        alash@lashgoldberg.com
                                        jfineberg@lashgoldberg.com
                                        mehren@lashgoldberg.com

*Counsel for Plaintiffs Emergency Care Services of Pennsylvania, P.C. and
Emergency Physician Associates of Pennsylvania, P.C.*